**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| ANNA KOVINA, et. al | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00150-JAG |
| | ) | |
| RICHMOND WALDORF SCHOOL | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' REQUEST FOR TEMPORARY RESTRAINING ORDER**

The Defendant Richmond Waldorf School ("School") states as follows in opposition to Plaintiffs' request for a Temporary Restraining Order under Rule 65 of the Federal Rules of Civil Procedure.[1]

**FACTUAL AND PROCEDURAL BACKGROUND**

The School is a not-for-profit, independent private school that offers an educational program for students from preschool through grade eight.  The School is small, with only one class per grade.  Roberto Trostli is the teacher for the eighth-grade class.  Mr. Trostli is an experienced educator with decades of experience teaching in Waldorf schools.  He has taught the group of students that comprises the eighth-grade class since the students were in the first grade.[2] The Plaintiffs are D.K., currently an eighth-grade student at the School who enrolled in or around January of 2021, and her parents, Anna Kovina and Fred Johnson (the "Parents") (collectively

---

[1] In submitting this Opposition the School does not waive and specifically reserves its rights to file a responsive pleading within the timeline prescribed by the Federal Rules of Civil Procedure.

[2] One of the unique aspects of a Waldorf school is that the teacher starts with the class in the first grade and moves up with the students each year until they graduate after eighth grade.

"Plaintiffs").  In their Complaint and Request for a Temporary Restraining Order ("TRO"), the Parents, proceeding pro se, assert claims for discrimination and retaliation, on their own behalf and on behalf of their daughter, D.K., under Title IX of the Educational Amendments Act of 1972.[3]

This case arises out of the School's efforts to proactively address the unkind behavior of three students—D.K., another female student (Student A), and a male student (Student B)—against a female classmate (Student C).  On February 11 and 14, 2022, Mr. Trostli observed D.K., Student A, and Student B engaging in unkind behavior towards Student C.  He addressed D.K., Student A, and Student B regarding their behavior.  On February 17, 2022, Student C's parents reported to Mr. Trostli and the Interim Director of School, Nancy Cross, that Student C would not be returning to school due to concerns with the behavior of the other students.[4]  In response to the report, Mr. Trostli told all three students to stop the behavior, reported the incident to Mrs. Cross, and drafted an incident report and shared it with Mrs. Cross for her use in communicating with the parents of the three students.  To ensure that the unkind behavior did not persist, on February 18, 2022, Mr. Trostli monitored D.K., Student A, and Student B closely throughout the day.  That same day, Mrs. Cross communicated with the parents of all three students.  Other than counseling the three students to stop their unkind behavior, being vigilant of the behavior the following day, and sharing with the parents what had occurred, the School took no other action against D.K., Student A, or Student B.  They were treated identically.

---

[3] Although Plaintiffs also list the American Rescue Plan Act as the basis of their lawsuit, there is no factual allegation related to how the School violated the American Rescue Plant Act.

[4] The impact of the unkind behaviors on Student C was significant.  Student C inflicted self-harm as a result, and there also was evidence that she would further commit self-harm.

In response to the report, the parents of Student A and Student B took proactive steps to ensure that the unkind behavior stopped, and both students remained in school.  In contrast to the response of those parents, D.K.'s parents accused Mr. Trostli of, among other things, "retaliating" against D.K. because of a prior disagreement he had with her father, Mr. Johnson. The Parents also denied that D.K., a teenager, had engaged in any unkind behavior and claimed that Mr. Trostli's vigilant monitoring of the students' behavior (after having addressed it repeatedly) somehow caused D.K. emotional harm.  They even demanded that Mr. Trostli be removed from the school.  In an email dated Saturday, February 19, 2022, the Parents demanded to "know what steps the school plans to take to insulate [D.K.] from Mr. Trostli."  The Parents then removed D.K. from school beginning Monday, February 21, 2022, allegedly on the advice of D.K.'s therapist.

While the Parents voluntarily kept D.K. out of school, the School provided D.K. with access to its curriculum and other activities, in accordance with the Parent's demands.[5]  Mrs. Cross was in frequent communication with the Parents, answering their questions and demands, and, on numerous occasions, reiterated that D.K. was welcome to return to school.  The Parents declined Mrs. Cross' invitation to return D.K. to school each time that Mrs. Cross brought up the subject.  Mrs. Cross also complied with the Parents' demand for a counselor by arranging to have a licensed clinical social worker meet with the class and with D.K. and her parents.[6]

After the Parents had voluntarily kept D.K. out of school for two weeks, School staff held a meeting with the Parents on March 4, 2022, to discuss D.K.'s return to school.  The meeting was contentious and unproductive; the Parents remained distrustful of the School and Mr.

[5] It is also noteworthy that D.K. received the same services and access to the School's curriculum as Student C, who also was and remains at home since being subjected to unkind behavior.

[6] The School does not have a school counselor on staff.

Trostli.  In fact, in response to Mrs. Cross' continued urging that D.K. return to school, the Parents stated that they would think about it.  Following that meeting, the Parents continued to keep D.K. out of school for a third week, and the School continued to provide work for D.K. She did come on campus for some activities, such as basketball practice.

On March 10, 2022, nearly three weeks after the Parents voluntarily removed D.K. from school, Mrs. Cross provided a Program Adjustment Plan (the "Plan"), which outlined a proposal for D.K. to finish out the remainder of her eighth-grade year and graduate from the School.  In accordance with the Parent's demands since mid-February, the Plan allowed D.K. to complete her coursework and many other activities with limited interactions with Mr. Trostli, which was made in response to the Parents' insistence that D.K. be "insulated" from Mr. Trostli.

Despite being granted their request that the School devise a plan to "insulate" D.K. from Mr. Trostli, the Parents rejected the Plan.  Mrs. Kovina contacted members of the Board of Trustees of the School, alleging for the first time that the Plan constitutes "prima facie retaliation for reporting misconduct and sex-based discrimination."  Despite the fact that neither the Parents nor D.K. had actually reported any sex-based discrimination or engaged in any other protected activity sufficient to form the basis of a retaliation complaint (and further despite the fact that in various prior emails, Ms. Kovina attributed the conflict to other causes, including the hostility between Mr. Trostli and Mr. Johnson), the Chair of the Board of Trustees responded to Ms. Kovina that an investigation would be conducted, that D.K.'s educational services would remain in place, and that D.K. was welcome to return in-person to all classes not supervised by Mr. Trostli, pending the outcome of investigation.

The Parents continued to insist that the School comply with their ever-shifting list of demands.  The School had been urging the Parents to return D.K. to the classroom since the

incident occurred, so the School acquiesced, notifying the Parents on March 17, 2022, that the Plan had been withdrawn and that the School was "prepared for [D.K.]'s full return to the classroom, class assignments, and Specialty classes." Still unsatisfied, the Parents proceeded with the instant motion and suit.

In their Complaint and Request for TRO, the Parents claim, inexplicably, that the Plan, which was devised to comply with their demands, constitutes sex discrimination and retaliation under Title IX. For the reasons stated below, the Court should deny the TRO because the Parents lack standing to bring this action on their own behalf and, because neither Parent is a licensed attorney, they cannot assert a claim on behalf of D.K. either. Regardless, the School's supportive plan did not constitute sex discrimination or retaliation because it was created in response to the Parents'express request to limit D.K.'s interaction with Mr. Trostli, and, regardless, the School has since offered for D.K. to return to the classroom, rendering moot the need for a TRO.

## **ARGUMENT**

As a general matter, "[w]hile a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." Hoescht Diafoil Vo. V. Nan Ya Plastics Corp., 174 F.3d 411, 422 (4th Cir. 1999). Regardless, "[t]he standard for granting either a TRO or preliminary injunction is the same." Moore v. Kempthorne, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) (internal quotation marks and citations omitted). For a TRO to be granted, a plaintiff must show (1) likelihood of success on the merits; (2) that plaintiff is likely to suffer irreparable harm in the absence of the injunction; (3) that the balance of equities tip in plaintiff's favor; and (4) that granting the TRO is in the public interest. Larus Cloud Serv. v. Laruscloudservices, No.

1:20-cv-310, 2020 U.S. Dist. LEXIS 148426, *7-8 (E.D. Va. Mar. 20, 2020); Reladyne
Reliability Serv. v. Bronder, No. 2:20cv377, 2020 U.S. Dist. LEXIS 178856, *4-10 (E.D. Va.
Aug. 4, 2020).  Both preliminary injunctions and temporary restraining orders "are extraordinary
remedies involving the exercise of a very far-reaching power to be granted only sparingly and in
limited circumstances."  Sarsour v. Trump, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (internal
quotations and citation omitted).  As demonstrated below, all four factors tip the balance in the
School's favor, and the Court should deny the Parents' request for a TRO.

I.      **Plaintiffs are not likely to succeed on the merits.**

A.      **The Parents lack standing to assert Title IX claims on their own
        behalf.**

"On a motion for a preliminary injunction, a plaintiff's burden of showing a likelihood of
success on the merits necessarily depends on a likelihood that plaintiff has standing."  Courtland
Co. v. Union Carbide Corp., No. 2:21-cv-00101, 2021 U.S. Dist. LEXIS 65818, *27-28 (S.D.W.
Va. Apr. 5, 2021) (citing Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir. 2015)).  Here, in
addition to asserting claims on behalf of D.K., the Parents also assert individual claims under
Title IX.  But as the United States District Court for the Southern District of West Virginia has
observed, courts around the country consistently have held that parents lack standing to bring
individual claims under Title IX.  See Dunlap v. Monroe Cnty. Bd. of Educ., No. 1:16-11535,
2017 U.S. Dist. LEXIS 172151, *11-13 (S.D.W. Va. Oct. 18, 2017) (collecting cases).  For these
reasons, the Parents are not likely to succeed on the merits of their individual Title IX claims.

B.      **Because the Parents are not licensed attorneys, they cannot represent
        D.K. in this case.**

Neither Parent is licensed to practice law in Virginia.  Accordingly, they are prohibited
from bringing a pro se claim on behalf of their daughter, D.K.  See Gallo v. United States, 331 F.
Supp. 2d 446, 447 (E.D. Va. 2004) ("Although 28 U.S.C. § 1654 gives litigants the right to bring

civil claims <u>pro se</u>, courts are nearly unanimous in holding that a parent or guardian cannot sue on behalf of a child without securing counsel.") (citations omitted); <u>Brown v. Ortho Diagnostic Sys.</u>, 868 F. Supp. 168, 170 (E.D. Va. 1994).  Plaintiffs, therefore, are not likely to succeed on the merits for the claim brought on behalf of D.K. either.

### C.    The School did not discriminate against Plaintiffs.

The Parents cannot properly bring a discrimination or retaliation claim under Title IX individually or on behalf of D.K., and even assuming that Title IX is applicable to the School, those claims are not likely to succeed on the merits.  In the Complaint, Plaintiffs appear to argue that the School treated D.K. differently than a male student in its disciplinary process.  This claim is a "selective enforcement theory" under Title IX, which requires "facts demonstrating that the plaintiff's gender was a motivating factor for the different treatment."  <u>Sheppard v. Visitors or Va. State Univ.</u>, No. 3:18cv723-HEH, 2019 U.S. Dist. LEXIS 198012, *4-5 (E.D. Va. Nov. 14, 2019) (citing <u>Yusuf v. Vasar Coll.</u>, 35 F.3d 709, 715 (2d Cir. 1994); <u>Sterno v. Shenandoah Univ.</u>, 278 F. Supp. 3d 924, 932 (W.D. Va. 2017)).  To succeed under this theory, a plaintiff also must show that she is similarly situated to her comparator.  <u>Id.</u> at *6.

Plaintiffs cannot make any such showing in this case.  Other than a conclusory allegation that D.K. was treated differently than a male student (Student B), Plaintiffs allege no other facts to support this claim.  <u>See generally</u> Complaint.  Plaintiffs' failure to do so dooms their claim.  <u>See Sheppard</u>, 2019 U.S. Dist. LEXIS 198012, at *5 ("'However, allegations of a procedurally or otherwise flawed proceeding… combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.'") (quoting <u>Yusuf</u>, 35 F.3d at 715).

Nor is Student B similarly situated to D.K.  As highlighted above, after Mr. Trostli observed D.K., Student A, and Student B engaging in unkind behavior towards Student C, he

took proactive steps to address the behavior, and Student A and Student B returned to school. Unlike those two students, however, the Parents kept D.K. home, after accusing Mr. Trostli of engaging in "retaliation" because of a prior disagreement that he had with her father, claiming that Mr. Trostli's vigilant monitoring somehow caused D.K. emotional harm, and insisting that D.K. be insulated from Mr. Trostli. Only in response to the Parents' concerns did the School devise a plan for D.K. to have limited interactions with Mr. Trostli when she returns for in-person instruction. Because Student B's parents did not make a similar request, the School had no reason to offer a similar proposal for him. Accordingly, D.K. and Student B are not similarly situated. Student B, however, is similarly situated to Student A, a female student, who was treated identically to Student B. For these reasons, Plaintiffs are not likely to succeed on their discrimination claim.

Plaintiffs' retaliation claim meets a similar ending. A prima facie case of retaliation under Title IX requires a showing of "(1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the activity and the adverse action." Davis v. Univ. of N.C., No. 1:19CV661, 2020 U.S. Dist. LEXIS 178539, *26 (M.D.N.C. Sep. 29, 2020) (citations omitted).

The prima facie case fails for two reasons. First, the Plan that the School devised for D.K. to return to school, with limited interaction with Mr. Trostli, did not constitute an adverse action. To the contrary, the School proposed the Plan for D.K.'s transition back to school in response to the Parents' voluntary decision to remove her from school and their insistence that D.K. be "insulated" from Mr. Trostli. Because it was devised in response to the Parents' demands and was designed to return D.K. to school, as opposed to keeping her out of school, the Plan could not have constituted an adverse action. Second, there is no casual connection

between Plaintiffs' protected activity and the alleged "adverse action."  Indeed, the first time that the Parents complained about sex discrimination was <u>after</u> they received the School's proposed Plan to return D.K. for in-person instruction.[7]  Accordingly, there can be no causal connection.

## II.     Plaintiffs are not likely to suffer irreparable harm.

As demonstrated above, there is no irreparable harm because the School has since offered for D.K. to return to the classroom full time.  See <u>Gregor v. W. Va. Secondary Schs. Activities Comm'n</u>, No. 2:20-cv-00654, 2020 U.S. Dist. LEXIS 187428 (S.D.W.Va. Oct. 9, 2020) (denying temporary restraining order under Title IX when plaintiff continues to have access to the school's educational activity).  Moreover, the School's offer expressly voids the Plan and enables D.K. to return to the classroom on the same basis as every other student in the class.  Any of Plaintiffs' complaints about the Plan are now moot.

## III.    The balance of equities does not tip in Plaintiffs' favor.

A party seeking equitable relief, like a TRO, may not be "tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  See <u>Precision Instr. Mfg. Co. v. Auto. Maintenance Mach. Co.</u>, 324 U.S. 806, 814 (1945).  Indeed, even mere "inflexibility" on the part of a party seeking injunctive relief invokes "[c]oncerns of fairness and equity" that suggest such behavior "should not be rewarded with the extraordinary remedy of an injunction."  <u>Safeway Inc. v. CESC Plaza Ltd. P'ship</u>, 261 F. Supp. 2d 439, 474 (E.D. Va. 2003).  The balance of equities does not tip in Plaintiffs' favor here because the Plan proposed by the School was undertaken in order to address the Parents' complaints in the first place and did precisely what they asked for by

---

[7] While the Parents did complain after they received the initial incident report about D.K.'s unkind behavior, the complaint at that time did not involve any allegations of discrimination or retaliation based on sex.

separating D.K. and Mr. Trostli.  But then the Parents flip-flopped on their demands.  After first

demanding that D.K. not be subjected to Mr. Trostli's presence, they then insisted that Mr.

Trostli go right back to teaching her.  This dispute arises not from any anti-D.K. initiative by the

School, but from the School's inability to keep up with the Parents' constantly mutating

demands.  In other words, the Parents have created this dispute, and so cannot now use it as a

sword to seek extraordinary equitable relief in their favor.

**IV.     Granting the TRO is not in the public interest.**

Finally, public interest weighs against granting a TRO because the steps that the School

took in this case were designed to keep students safe.  Upon notice that D.K., Student A, and

Student B were engaging in unkind behavior towards Student C, Mr. Trostli addressed the

behavior by telling the three students to stop, preparing an incident report for Ms. Cross's use in

communicating with their parents, and monitoring the three students the next school day to

ensure that unkind behaviors did not persist.  In response to these reasonable actions designed to

keep students safe, the Parents took extraordinary steps of removing D.K. from school, claiming

that those actions caused D.K. to suffer emotional trauma, and demanding that Mr. Trostli be

removed from the classroom.  But when the School addressed the Parents' concern by devising a

plan to transition D.K. back to the classroom, the Parents inexplicably claimed that the School

discriminated and retaliated against D.K.  Granting Plaintiffs' request for a TRO in this situation

sends the signal that a school cannot take reasonable steps to protect its students, undermining

public interest in promoting a school's ability to address unkind behaviors.  See, e.g., Turner v.

South-Western City Sch. Dist., 82 F. Supp. 2d 757, 768 (S.D. Oh. 1999) (denying preliminary

injunction and explaining that "public interest will be served if school officials are permitted to

regulate conduct which relates to school safety and discipline; to ensure the safety of the student body.").

WHEREFORE, Richmond Waldorf School respectfully requests that the Court enter an Order denying Plaintiffs' request for a Temporary Restraining Order and awarding it such further relief as the Court deems appropriate.

Respectfully submitted,

Richmond Waldorf School

By Counsel

  /s/ Stacy Haney
Stacy Haney (VSB No. 71054)
Pakapon Phinyowattanachip (VSB No. 80799)
Haney Phinyowattanachip PLLC
11 South 12th Street, Suite 100B
Richmond, VA 23219
Tel.:    (804) 500-0310
Fax:    (804) 500-0309
Email: shaney@haneyphinyo.com
         pakaponp@haneyphinyo.com

Counsel for Richmond Waldorf School

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2022, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system.  I will then send the document and a notification of such filing (NEF) to the following parties via U.S. Mail and email:

> Anna Kovina
> Fred Johnson
> D.K.
> 108 Tempsford Lane
> Richmond, VA 23226
> fairynectarfarm@gmail.com

> /s/ Stacy L. Haney
> Stacy L. Haney, Esq. (VSB 71054)
> Pakapon Phinyowattanachip (VSB No. 80799)
> Haney Phinyowattanachip PLLC
> 11 South 12th Street, Suite 100B
> Richmond, VA 23219
> Tel.:   (804) 500-0310
> Fax:   (804) 500-0309
> Email: shaney@haneyphinyo.com
>            pakaponp@haneyphinyo.com
>
> Counsel for Richmond Waldorf School